Filed 3/15/21  P. v. Pauldo CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BUDDIE L. PAULDO IV,<br><br>    Defendant and Appellant. | B304703<br><br>(Los Angeles County<br>Super. Ct. No. BA476449) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Drew E. Edwards, Judge.  Affirmed.

Jack T. Weedin, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Michael Katz, Deputy Attorney General, for Plaintiff and Respondent.

Buddie L. Pauldo IV appeals the judgment entered after a jury convicted him of assaulting Fermin Rivera.  Pauldo contends his conviction should be reversed for evidentiary and instructional error and prosecutorial misconduct.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The First Amended Information*

Pauldo was charged in a first amended information with assault with a deadly weapon, identified as a "golf club/metal stick," (Pen. Code, § 245, subd. (a) (1))[1] (count 1) and making a criminal threat (§ 422, subd. (a)) (count 2)).  The amended information also specially alleged as to the second count Pauldo had personally used a deadly or dangerous weapon when committing the offense (§ 12022, subd. (b)(1)).

2. *Evidence at Trial*

The People's theory of the case was that Pauldo, without provocation, verbally accosted Rivera and then assaulted Rivera with a golf club.  Pauldo, who testified in his own defense, claimed Rivera and his wife, Aida Aguilar, were the aggressors and he had only responded to Rivera's attack in self-defense.

a. *The People's evidence*

On the morning of March 25, 2019 Rivera and Aguilar were setting up the food truck that Aguilar operated on Hollywood Boulevard, an area visited by many tourists.  Rivera observed Pauldo a few storefronts down, smoking with another person.  Rivera left at 11:00 a.m. to run errands.  Aguilar observed Pauldo, whom she had seen smoking marijuana throughout that day, talking to himself, making gestures and appearing angry

---

[1]     Statutory references are to this code unless otherwise stated.

and aggressive.  She once saw him push and kick people in their backs as they walked by.

Rivera testified he returned from his errands at 2:00 p.m. and saw Pauldo standing at the corner, holding a blade in one hand and a piece of metal in another.  Pauldo put both objects in his pockets and angrily asked if Rivera was staring at him and if Rivera "was a bitch."  Although Rivera repeatedly told Pauldo he "didn't want any problems," Pauldo, continuing to use foul language, approached Rivera.  The two argued for a few minutes, and Pauldo punched Rivera near his ear.  Tourists separated them, and Rivera started walking away, toward the truck.

Pauldo, calling Rivera "a little bitch," yelled at Rivera to come back and then pursued him.  Pauldo grabbed a stool on the side of a tour booth and threw it at Rivera, who caught it and placed it on the ground.  Pauldo had a golf club in his hands.  Swinging the golf club like a baseball bat, Pauldo tried to hit Rivera.  To shield himself, Rivera held up the stool that had been thrown by Pauldo.  The golf club hit the chair.  Pauldo swung the golf club three times downward at Rivera, each time hitting the stool.  The club broke on the third swing, and the severed piece made contact with Rivera's back as it fell to the ground.

Others intervened.  Rivera walked away from Pauldo toward the truck, but Pauldo followed along in the street insulting him.  Rivera stopped in front of a luggage store, which had two sets of doors, an exterior metal garage door and an interior glass-framed door.  When Pauldo came toward him from the road onto the sidewalk, Rivera backed into the interior

entrance of the store.  Pauldo continued to yell insults at Rivera and told him to get outside.

Pauldo then charged at Rivera into the store while holding a metallic object with at least a three-inch point protruding from his hand.  As Rivera tried to cover himself with his forearm, Pauldo scratched him with the metal object, causing two small cuts, one on Rivera's arm and another on his face, near a tear duct.  Rivera took a step back, tripped over luggage and fell onto his back.  Pauldo fell on top of him.  Pauldo punched Rivera repeatedly in the face and several times in the chest and arm as Rivera tried to push Pauldo away.  Suddenly Pauldo stood up and left Rivera, who was bleeding profusely on the carpet.  When Aguilar went to Rivera, Pauldo, who by then was again out on the street, called her a bitch and a prostitute and threatened to go and bring his sister to beat her.  Rivera also heard Pauldo tell another person he was going to return and kill Rivera and Aguilar.

In her testimony Aguilar confirmed that Pauldo swung a golf club at Rivera and, when Rivera blocked it with the chair Pauldo had thrown, the golf club broke.  Aguilar also testified she went inside the luggage store when Rivera was lying on his back with Pauldo on top of him.  To frighten Pauldo into leaving Rivera and to defend herself, Aguilar pulled out a kitchen knife she used for her work.  Pauldo turned, saw Aguilar with the knife in her hands, got up and ran outside.  During the entire incident Pauldo was screaming, including that he was going to kill Rivera and Aguilar.

John Mashian, the owner of the luggage store, testified he heard yelling, stepped outside and saw Pauldo holding a golf club above his head and Rivera holding a stool in front of his body.

Believing someone would get hurt, Mashian called the 911 emergency operator to report a fight.  As Mashian was talking on the phone, Pauldo and Rivera walked toward his store.  Pauldo and Rivera no longer had the golf club or chair.  Mashian heard Pauldo say to Rivera, "I'm going to mess you up."  Rivera reached the front of Mashian's shop, an open space with a large garage door entrance, and Pauldo was a few feet away from Rivera on the sidewalk.  Mashian saw Pauldo rush at Rivera into the store.  Rivera fell on his back inside the shop.  Pauldo moved on top of Rivera, punching him in the face and upper body.  Pauldo appeared angry and agitated.  Others, including Aguilar, came into the store to pull Pauldo off Rivera.  Pauldo went outside, still upset and agitated, and paced back and forth in the street.

The audio recording of Mashian's 911 call was played for the jury.  As Mashian was explaining that Pauldo "has got a big . . . metal golf thing," Pauldo could be heard in the background saying, "I'm about to fuck you up!," immediately followed by "You're not leavin' bro" and "I'm about to back you up.  You're not leaving cuz."  Pauldo later stated, "I'm gonna dead clock you son."  Pauldo also yelled, "[Y]ou a bitch nigga.  A bitch cause you running [unintelligible]."  Mashian then exclaimed, "They are coming in the store.  Call the cops please!"  Sometime later Aguilar spoke.  Her statements included (as translated from the original in Spanish) "Stupid!  What the fuck!  Go away!" and "[C]all the police."  Mashian stated, "This guy is hurt.  The Mexican guy [Rivera] is bleeding really bad."

       b.   *Evidence for the defense*

Pauldo, although admitting he had been smoking marijuana, denied talking to himself, making hand gestures or kicking or pushing anyone who walked by him.  Describing his

first contact with Rivera, Pauldo said he had been leaning against a pole when, feeling a presence near him, he turned and discovered Rivera standing behind him. Pauldo denied having any knives or anything metal on him at the time. Pauldo asked Rivera what he was looking at. Rivera pulled out a switchblade, which was closed at the time, and responded, "Get the fuck out of here. I am not looking at you." Pauldo asked why Rivera pulled a knife on him and told Rivera to "fight [him] like a man." Rivera said some words, including "Shut the fuck up." While Pauldo and Rivera were arguing, Aguilar tried to pass Rivera a butcher knife, but Rivera did not take it.

Pauldo intended to "let [the situation] go," but Rivera took a swing at him. Although Pauldo blocked Rivera's punch, it grazed Pauldo's head. Rivera opened his switchblade and slashed Pauldo's shoulder. Rivera then grabbed a golf club from the front of a store and swung it at Pauldo. Rivera hit Pauldo one time on the head with the golf club. Pauldo blocked a second swing with his hand. Pauldo managed to take the club from Rivera. As he did, Rivera picked up a bar stool. Pauldo and Rivera swung at the same time. The golf club and the stool hit each other, and the golf club broke. Rivera picked up the broken golf club and used it to slice Pauldo on his back and stab Pauldo on his right shoulder. In response Pauldo "kneed [Rivera] in the stomach," and Rivera fell back. Pauldo got on top of Rivera to prevent him from using the golf club and punched Rivera twice in the face. Aguilar then approached the men with a knife, but Rivera did not take it.

Pauldo ran around Aguilar and out of the store, walked across the street and stayed in the area. He did not call 911 because a police car had been across the street the entire time and he assumed the police were aware of what had happened.

Pauldo testified he felt a sharp pain when Rivera had hit Pauldo's hand with the golf club and his hand had been swelling. When asked about another witness's trial testimony that his medical records had indicated no visible swelling, Pauldo replied, "They probably just missed it." When asked whether there was any bruising or swelling to his head when the golf club had hit it, he replied, "I got braids, so—," and explained his braids "probably" provided "a little cushion."

After the audio recording of Mashian's 911 call was played for him, Pauldo was asked, "You told [Rivera] you were about to fuck him up, and he is not leaving, bro?" Pauldo denied saying this; rather, he testified, he had said, "I could pack you out," which means "jump someone." He also denied saying, "I am going to dead clock you, son" and explained, "It sounds like, 'I would have popped you.'"

Los Angeles Police Officer Ron Rojo, who at the time of the incident was a trainee, testified he had been among the officers who responded on March 25, 2019 to a second 911 call about Pauldo, made when Pauldo returned to the scene sometime after the fight. While Rojo was detaining Pauldo and seconds after Pauldo told Rojo he had witnesses and did not want "to get screwed over," Pauldo called out to a man walking by, "Hey, you were right there when the incident happened." Officer Rojo interpreted that to mean the man, whose name he later learned was Darius, might have seen the incident. Pauldo wanted Darius to come down to the station. Darius wrote something down instead, told Pauldo to call him and gave Rojo the piece of paper. Rojo asked Darius for his name to write on the paper. Rojo did

not book the paper into evidence, did not recall what he did with it and did not call Darius.[2]

3. *The Verdict and Sentencing*

The jury found Pauldo guilty of assault with a deadly weapon, but deadlocked as to the charge of making a criminal threat. The trial court declared a mistrial on that count. The court sentenced Pauldo to the upper term of four years in state prison.

## DISCUSSION

1. *The Trial Court Did Not Commit Reversible Error in Admitting Evidence of Pauldo's Promotion of a Song Referring to a Street Gang*

a. *Background concerning the Parcbo song*

Rivera testified that, while he was still inside the luggage store after being pummeled, Pauldo, by then on the street yelling, threatened him and his wife while claiming to be a gang member from Compton. "[Pauldo] was out there telling a guy, another . . . guy who was with him, to remember our faces because he was going to come back and kill us because he belonged to [a] Compton gang." Rivera was afraid Pauldo or one of Pauldo's gang friends "might actually come back and kill [him]."

---

[2] Prior to trial, Pauldo moved to dismiss the charges or for imposition of other sanctions for destruction of evidence based on the loss of the Darius paper. The trial court initially denied the motion, but ruled the issue could be raised again later. Subsequently, the court again denied the request to dismiss but ruled it would give a curative instruction and permit defense counsel to examine Officer Rojo about the destruction of the evidence.

During Pauldo's direct examination his attorney asked, "Did you at any point say to Mr. Rivera or talking to your friend and say to your friend, 'Remember his face' or 'I'm going to remember your face because I am in a Compton gang and I am going to come back and kill you'?" Pauldo answered, "Definitely not." He also testified he did not at any point threaten to kill Rivera.

Pauldo had explained his presence in Hollywood on the day of the incident, testifying he had been on Hollywood Boulevard passing out flyers advertising the music, which "[m]y label made," of a friend who went by the artist name Parcbo. The flyers were little cards that, if scanned, would "send you to the website where you can check out [Parcbo's] music." On cross-examination the prosecutor asked Pauldo if Parcbo was a Compton Crip. Pauldo responded, "I don't think so." Pauldo also later said, "I am not from a gang."

At a sidebar conference the prosecutor said he intended to introduce the lyrics to the first 30 seconds of Parcbo's song, as well as the testimony of an officer regarding Parcbo's Compton Crip gang membership. Defense counsel objected to the evidence as irrelevant and unduly prejudicial.

At an Evidence Code section 402 hearing the prosecutor stated Parcbo is a well-known Compton Crip. He also told the court the flyers advertising Parcbo's music, which had been introduced in evidence by defense counsel, contained a link to Parcbo's song that in its initial 30 seconds referred to Parcbo's allegiance to the Crips three times. The prosecutor explained the lyrics thus undermined Pauldo's credibility in claiming he did not think Parcbo was a Compton Crip and bolstered the credibility of Rivera's testimony that Pauldo had claimed to be a gangster from

Compton when threatening to kill Rivera. Defense counsel, after arguing against admission of the evidence, stated, if the court intended to admit it, she would stipulate that Parcbo's song referred to gang language but not that Parcbo was a gang member or that Pauldo knew about Parcbo's gang membership.

The parties agreed to the following stipulation, which was read to the jury: "The People and the defense stipulate that a song, 'Parc Life,' . . . by the rap artist Parcbo . . . is a three minute and 31 second song in which the artist Parcbo references a street gang, and that during the song Parcbo makes references to the various criminal activities of a street gang."

Referring to Pauldo's threat, "Remember their faces. I am a gangster from Compton. I'm going to come back and kill them," the prosecutor in his closing argument told the jury, "I am not arguing [Pauldo] is a gang member. I don't know. I am not saying that he is. I don't even honestly know if he knows [Parcbo]. Maybe he does or doesn't. What matters to the case is he said that. He made that threat to the victim. He made that threat in order to put him in fear."

### b. *The trial court did not abuse its discretion in admitting evidence of the Parcbo song lyrics*

On appeal Pauldo contends the trial court abused its discretion in admitting evidence of the Parcbo song lyrics because they were both irrelevant and unduly prejudicial. (See Evid. Code, §§ 350 [only relevant evidence is admissible], 352 ["[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice"]; *People v. Jones* (2017) 3 Cal.5th 583, 609 ["'[a]n appellate court reviews a court's rulings regarding relevancy and admissibility under

10

Evidence Code section 352 for abuse of discretion'"]; *People v. Nguyen* (2015) 61 Cal.4th 1015, 1073 [the trial court's determinations of the relevance of evidence are reviewed for abuse of discretion].)  He argues the lyrics were not relevant to either of the charges because there was no evidence Rivera, Aguilar or any other witness was aware of Parcbo or the lyrics of Parcbo's song and the first amended information included no gang allegations.

Relevant evidence is evidence having "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action," including information that relates to a witness's credibility.  (Evid. Code, § 210.)  Here, although Rivera and Aguilar may not have known Parcbo or been familiar with the lyrics of his music, that Pauldo was actively promoting his friend's song with its repeated references to a criminal street gang immediately before his encounter with Rivera had some tendency in reason to support Rivera's testimony that Pauldo claimed to be a member of a Compton gang when threatening Rivera's and Aguilar's lives. (See *People v. Williams* (2008) 43 Cal.4th 584, 634 ["[t]he trial court has considerable discretion in determining the relevance of evidence"].)  And Pauldo's self-identification as a gang member, whether true or not, supported the People's argument Pauldo's threat caused Rivera reasonably to be in sustained fear for his and Aguilar's safety—essential elements of the charge of making a criminal threat.  (Pen. Code, § 422; *In re George T.* (2004) 33 Cal.4th 620, 630; *People v. Toledo* (2001) 26 Cal.4th 221, 227-228; see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1053 ["[g]ang testimony was relevant . . . to explain how [defendant's] statement could induce fear in the victim"].)  Neither the absence

11

of a gang enhancement allegation nor the fact the song lyrics did not relate to any element of the aggravated assault charge diminished the evidence's relevance to the case. (Cf. *Hernandez*, at pp. 1049-1050 [observing, although evidence of gang membership should not be admitted in cases not involving a gang enhancement if its probative value is minimal, evidence of gang membership nevertheless "is often relevant to, and admissible regarding, the charged offense"].)

The trial court's additional determination admitting evidence of the Parcbo lyrics would not be unduly prejudicial was neither arbitrary nor capricious. (See *People v. Williams, supra,* 43 Cal.4th at pp. 634-635 [trial court's discretionary ruling under Evidence Code section 352 will not be reversed on appeal absent a showing the court "'exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice'"].) Rivera's testimony that Pauldo identified himself as a Compton gang member, as well as Pauldo's denial that he belonged to a gang or made that claim, was before the jury regardless of the court's ruling on the Parcbo lyrics. The parties' stipulation regarding the lyrics added little that could properly be classified as prejudicial as to Pauldo, except perhaps to the extent it discredited his statement he did not believe Parcbo was a Compton Crip.

To be sure, gang references in the 911 recording were excised because, as the court observed, "Gang testimony can be very inflammatory for any defendant." But rather than supporting Pauldo's argument the court abused its discretion in admitting the evidence of the Parcbo lyrics, the exchange between the court and the prosecutor that led to the use of a redacted version of the 911 recording demonstrates a court

sensitive to the potential impact of gang-related evidence and that carefully weighed the probative value of evidence against the potential prejudice. There was no abuse of discretion.

c. *Any error in admitting evidence of the song lyrics was harmless*

In any event, any error in admitting evidence of the Parcbo lyrics would not require reversal of Pauldo's conviction for assault with a deadly weapon. The evidence that Pauldo attacked Rivera was supported not only by the testimony of the victim and his wife but also by the disinterested luggage store owner. It is not reasonably probable Pauldo would have obtained a more favorable result if the lyrics' gang references had been excluded. (See Evid. Code, § 353, subd. (b) [verdict may be set aside and judgment may be reversed for the erroneous admission of evidence only if the error "resulted in a miscarriage of justice"]; *People v. Richardson* (2008) 43 Cal.4th 959, 1001 ["'[a] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error'"].) The prosecutor told the jury he did not know whether, and was not arguing, Pauldo was a gang member. Moreover, the jury, although finding against Pauldo on the aggravated assault count, deadlocked on the charge of making a criminal threat, a mixed result that indicated the jurors had carefully considered all the evidence presented and had not overreacted to the lyrics' reference to street gangs in determining Pauldo's guilt.

13

## 2. *Pauldo Failed To Establish Prosecutorial Misconduct*
### a. *Governing law and standard of review*

""""A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury."""" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1331-1332; accord, *People v. Rivera* (2019) 7 Cal.5th 306, 333-334.) Bad faith on the prosecutor's part is not required. (*People v. Hill* (1998) 17 Cal.4th 800, 821; accord, *People v. Lloyd* (2015) 236 Cal.App.4th 49, 61; but see *People v. Molano* (2019) 7 Cal.5th 620, 674 ["a claim of misconduct based on allegations that the prosecutor elicited evidence in violation of a court order requires proof that the prosecutor acted deliberately or intentionally"].) In this regard, "'[t]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667; see *People v. Sandoval* (2015) 62 Cal.4th 394, 438.) "[T]he burden of proof is on the defendant to show the existence of misconduct." (*People v. Van Houten* (1980) 113 Cal.App.3d 280, 292.)

Ordinarily, """"[t]o preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument."""" (*People v. Charles* (2015) 61 Cal.4th 308, 327; see *People v. Beck and Cruz* (2019) 8 Cal.5th

14

548, 657 [""As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion— and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety""].)  The forfeiture doctrine does not apply when a request for an admonition would have been futile or would not have cured the harm.  (*People v. Seumanu*, *supra*, 61 Cal.4th at pp. 1328-1329; *People v. Hill*, *supra*, 17 Cal.4th at p. 820.)

When the issue has been preserved, we review a trial court's ruling regarding prosecutorial misconduct for abuse of discretion.  (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.)  A defendant's conviction will not be reversed for prosecutorial misconduct that violates state law "'unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.'"  (*People v. Wallace* (2008) 44 Cal.4th 1032, 1070-1071; accord, *People v. Rivera*, *supra*, 7 Cal.5th at p. 334.)  "Federal constitutional errors subject to harmless error review," in contrast, "are reviewed under *Chapman* [*v. California* (1967) 386 U.S. 18]," which requires a reviewing court "to reverse the conviction unless the People can demonstrate that the error was harmless beyond a reasonable doubt."  (*People v. Reese* (2017) 2 Cal.5th 660, 671.)

> b.  *Most of Pauldo's prosecutorial misconduct arguments have been forfeited*

Pauldo contends the prosecutor committed misconduct on numerous instances, the cumulative effect of which requires reversal of his conviction.  Pauldo, however, forfeited nearly all of his prosecutorial misconduct arguments.

### i. *Questioning Pauldo about statements in his hospital records*

During cross-examination of Pauldo, the prosecutor, referring to Pauldo's hospital records, exhibit 10, told the court, "I am approaching the witness [Pauldo] with what has been previously marked as People's 10. I'll just show it to him on the overhead." Defense counsel objected the exhibit was "not potentially admissible at this point," and the court stated, "It is not admissible at this point." The prosecutor moved to admit the exhibit. The trial court responded, "What is actually in the medical reports is hearsay. You can certainly ask him a question about it. The document itself is hearsay." The prosecutor then asked Pauldo, "At 10:14 p.m., you told Nurse Koko that you had pain after getting into an altercation at the jail, do you remember saying that?" Pauldo replied, "No, I do not remember saying that." The prosecutor asked, "Again, about five minutes later, did you note to another individual that you [had] gotten into an altercation at the jail?" When Pauldo responded he had never gotten into any incident at the jail, the prosecutor asked, "I am asking you five minutes later if you told them again, at the hospital, that you got into an altercation at the jail?" Pauldo denied having done so.

After he had cross-examined Pauldo, the prosecutor again sought to introduce exhibit 10 into evidence, explaining, although defense counsel had objected on the ground of hearsay, the medical records that comprised exhibit 10 should be admitted because they constituted business records and "a statement of the party, the defendant"; he "was using them specifically to impeach [Pauldo's] testimony"; and "[t]hey would also be prior inconsistent statements." Defense counsel stated, "I believe my client can be

16

impeached, but they do not come into evidence.  The statements made about how injuries occurred during an incident in medical records are not admissible.  Counsel can impeach with the documents just like I impeach with the police report.  The same analysis would go forward with me wanting to introduce a police report. . . .  I believe it is inadmissible hearsay.  The medical records are alright for impeachment, but not admissible into evidence for the jury to review."  The court agreed the medical records were inadmissible hearsay and did not admit exhibit 10 into evidence.

Pauldo contends on appeal the prosecutor engaged in misconduct by questioning him about information allegedly contained in exhibit 10—specifically, Pauldo's alleged statements reflected in that exhibit.  He asserts the prosecutor, by examining Pauldo about those statements, had improperly referred to facts not in evidence and without a good faith basis the facts could be proved.  However, notwithstanding defense counsel's objection to the admissibility of exhibit 10, she did not object to the prosecutor's examination of Pauldo about the contents of exhibit 10 or to any of the prosecutor's questions of Pauldo that he now contends was improper.  Indeed, defense counsel conceded the prosecutor could use exhibit 10 to impeach Pauldo.  This claim of prosecutorial misconduct has been forfeited.

     ii. *Burden-shifting objection/disparagement of counsel*

In his closing argument the prosecutor stated, "On the one hand, LAPD wrote a crappy police report.  They had the last shift guy write it.  They didn't bother to do the best investigation.  Let me pull the police report out.  This is the Bible, and I am going to cross-examine the victim.  They didn't put one minute of the body

17

worn, the coverage. If that was not on there, I guarantee you they should have." Although defense counsel had objected (unsuccessfully) in the trial court on the ground of "burden-shifting," Pauldo argues on appeal the prosecutor's statements constituted misconduct by disparaging defense counsel. This claim of misconduct has been forfeited because no objection was made in the trial court on the ground Pauldo now asserts on appeal.

In any event, Pauldo fails to show the prosecutor's statements constituted improper disparagement of defense counsel, as Pauldo asserts. (E.g., *People v. Cash* (2002) 28 Cal.4th 703, 732 ["[i]t is misconduct for the prosecutor in argument to impugn the integrity of defense counsel or to suggest defense counsel has fabricated a defense"].) Whatever the prosecutor intended to convey to the jury by these largely incoherent comments, they do not suggest defense counsel had fabricated evidence or otherwise improperly disparage or impugn the integrity or character of defense counsel. (See *People v. Rhoades* (2019) 8 Cal.5th 393, 448 ["'it is neither unusual nor improper to comment on the failure to call logical witnesses'"]; *Cash*, at p. 733 ["[w]e accord the prosecutor wide latitude in describing the factual deficiencies of the defense case"]; cf. *People v. Demetrulias* (2006) 39 Cal.4th 1, 31-32 [prosecutor's argument that the defense's portrayal of the defendant as a victim constituted an "'attempt to distract'" the jury from the "'real victims'" and "that the jury should '[l]et that disingenuous attempt fall on deaf ears'" was proper and did not "improperly impugn[ ] defense counsel's integrity"].)

Although the headings for this section of Pauldo's appellate briefs also refer to burden-shifting, Pauldo provided no legal

argument or authority to support any contention that, by these cryptic statements, the prosecutor engaged in misconduct by improper burden-shifting. Accordingly, that issue is not properly before us. (See *Kaufman v. Goldman* (2011) 195 Cal.App.4th 734, 743 [appellate court may treat as forfeited any argument not "supported by both coherent argument and pertinent legal authority"]; *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546 [reviewing court need not consider an inadequately supported legal argument; "'[t]his court is not inclined to act as counsel for . . . appellant'"].)

### iii. *Other instances of alleged misconduct*

Defense counsel objected to a number of statements during the prosecutor's closing argument solely as "improper" or "improper argument" without specification of the purported impropriety. Pauldo's contention these statements constituted improper vouching or disparagement of defense counsel were forfeited by his failure to satisfy the requirement of making a specific objection in the trial court, which is necessary to preserve the claim on appeal (see *People v. Charles*, *supra*, 61 Cal.4th at p. 327; see also *People v. Fuiava* (2012) 53 Cal.4th 622, 728 [characterizing defendant's "improper argument" objection as "nonspecific"]; *People v. Fernandez* (2013) 216 Cal.App.4th 540, 560 [appellant "appropriately concedes" he forfeited prosecutorial misconduct argument by objecting one time each to the prosecutor's initial and rebuttal closing arguments "on the vague ground of 'improper argument'"]; cf. *People v. Hubbard* (2020) 52 Cal.App.5th 555, 561, 563 [where defense counsel objected to the prosecutor's argument as improper and specified the nature of the impropriety, the "objection and explanation" were adequate to preserve claim for appeal]):

19

- "I've been a prosecutor for approximately 10 years . . . ." "I did about five years as a sex crimes investigator in the Marines, four years in the district attorney's office."
- "Over the course of the last nine years, I think there has been a general hope of prosecutors that certain types of defense arguments might die out. It was kind of the advent of some things involving victims specifically. The Me Too Movements where we thought juries and people in general would reach a new understanding of how people and how people's memory are when they talk about specific events." "You know, it seems like it is getting worse. The annililationism [*sic*] I thought would go away. I thought defense counsel would say the argument—."
- "The defendant was basically led along by the hand by his counsel."

Other instances of prosecutorial misconduct were forfeited because, after an objection was actually or effectively sustained, Pauldo failed to request the court admonish the jury to disregard the inappropriate argument or other impropriety. (See, e.g., *People v. Beck and Cruz, supra,* 8 Cal.5th at p. 657; *People v. Charles, supra,* 61 Cal.4th at pp. 327-328; *People v. Winbush* (2017) 2 Cal.5th 402, 482.) Because the court had sustained Pauldo's objections, we cannot say a request for an admonition would have been futile or conclude a properly framed admonition would have been ineffective in preventing prejudice, if any, to Pauldo. (See *People v. Fuiava, supra,* 53 Cal.4th at p. 683.)

- "What I don't want it to do is this case end up being the trial of Ron Rojo or the trial of LAPD—." That

comment, made during the prosecutor's opening statement, drew an objection on the ground of "inappropriate argument." The trial court effectively sustained the objection by stating, "Counsel, I think you are kind of morphing into argument." No admonition was requested.

- "There is going to be an expectation of minor inconsistencies between each witness's testimony. It is going to happen. I think there is a minor inconsistency between Aguilar's testimony that she saw him punch several times and the Husband's testimony that he was only struck—." Defense counsel objected to those statements, made by the prosecutor during his closing argument, as vouching. The court sustained the objection, stating, "Counsel, that is improper argument. It is vouching." No admonition was requested.

- "You have to reach the conclusion that he was acting reasonable, using no more force than was reasonably necessary. To be totally frank, I don't think ultimately—." Despite a vague objection as "improper argument" to this statement made during closing argument, the trial court effectively sustained the objection, stating, "Once again, counsel, the jury can decide. Your opinion is not relevant." Notwithstanding the court's response, defense counsel did not request the court admonish the jury to disregard any improper argument by the prosecutor.

- "It is frustrating that so many cases end up turning to a charge not just on the defendant, but turning to LAPD. I don't care if LAPD never showed up—." Defense counsel objected as "improper argument." The trial court agreed, stating, "When you say you don't care, it is improper"; but defense counsel once again did not request an admonition to the jury.

Finally, Pauldo's argument the following statements constituted instances of prosecutorial misconduct has been forfeited because defense counsel made no objection at all:

- "Assuming everything [Pauldo] said is true, he did swing the golf club at him. Trust me. Everything he says at that point—and the guy has a chair up in his hair [*sic*], but, no, he only swung the golf club because [Pauldo] swung the chair. 'I wasn't swinging it at him, but "I was swinging at the chair. I was playing with him."' Everything about that is incredible." Although Pauldo on appeal asserts his counsel objected to these statements by the prosecutor in closing argument on the ground of "improper argument," the record shows that objection had been directed to other remarks by the prosecutor later in his closing. In any event, as discussed, an objection of "improper argument" is not sufficiently specific to preserve the claim on appeal.
- "The other instruction the defense always brings up, and it basically almost doesn't apply in this case, is the circumstantial evidence rule. That is basically circumstantial evidence and direct evidence are the two types of evidence you get."

22

- "If Mr. Rivera had a conviction, you bet you would have heard about it.  This is an individual, from the evidence before you, has spent the last 10 or 11 years working on Hollywood Boulevard and essentially has no convictions or problems with the law.  I can guarantee you if he had something like that, you would have been made aware of it."  Defense counsel did not object to those remarks.  As discussed, her objection as "improper" was directed to the prosecutor's later statement "[t]he defendant was basically led along by the hand by his counsel," which Pauldo on appeal contends constituted disparagement of defense counsel.  In addition, Pauldo's contention for the first time on appeal that the remarks about Rivera improperly argued facts not in evidence has been forfeited because his counsel failed to assert that specific objection.

    iv.  *No forfeiture exception*

Citing *People v. Friend* (2009) 47 Cal.4th 1, 29, Pauldo in his reply brief contends he did not forfeit his prosecutorial misconduct arguments, explaining trial counsel is not required to object to each instance of misconduct when the "'misconduct [is] pervasive, defense counsel [has] repeatedly but vainly objected to try to curb the misconduct, and the courtroom atmosphere was so poisonous that further objections would have been futile.'"  To demonstrate the requisite futility, Pauldo refers to the trial court's denial of defense counsel's request for a curative instruction following misconduct that he did not forfeit, which involved the prosecutor's question to Pauldo about his "conviction for a PC 245(a)(4), assault causing grievous bodily injury."

Nothing about this incident, which Pauldo describes in a single sentence, excuses defense counsel's failures to object or to request admonitions.

Prior to opening statements defense counsel requested a ruling on the admissibility of Pauldo's prior convictions that the People intended to use for purposes of impeachment. The prosecutor explained, although Pauldo had a number of convictions, he intended to impeach Pauldo with only three: a misdemeanor conviction for theft, a conviction for animal cruelty and a felony conviction for aggravated assault under section 245, subdivision (a)(4). The court stated its initial inclination to allow the People to impeach Pauldo with all three priors, including, as summarized by the court, for "a 245 assault with force likely to produce great bodily injury."

In response to defense counsel's objection the convictions, particularly the one for animal cruelty, were remote in time, the court excluded the 2009 animal cruelty conviction but allowed the 2010 misdemeanor conviction for theft and 2015 felony conviction for assault. Defense counsel then requested the court "sanitize the nature of the [2015 felony] conviction" and stated, "This is assault. It is an (a)(4) as opposed to an (a)(1).[3] I think if the jury hears he has the prior conviction for the same conduct, it would be too prejudicial." After hearing further argument, the court ruled, "I believe the conduct in this case is somewhat

---

[3]     Section 245, subdivision (a)(1), prohibits "an assault upon the person of another with a deadly weapon or instrument other than a firearm." Section 245, subdivision (a)(4), prohibits "an assault upon the person of another by any means of force likely to produce great bodily injury."

similar. It would be prejudicial to Mr. Pauldo, under Evidence Code 352, to admit the 2015 crime."

During her direct examination of Pauldo, defense counsel asked the court if it had changed its ruling regarding the admissibility of the 2015 felony conviction, and the court responded it had not. The prosecutor asked, "To be clear, I can say the felony assault, but not the specifics?" The court replied, "You can impeach him with the fact he has the felony conviction, but not the facts." Defense counsel asked, "He can say 'assault'?" The court stated, "He can. He can't go into the facts." Pauldo testified on direct he had been convicted in 2010 of misdemeanor petty theft and in 2015 of felony assault but that he had taken a deal rather than go to trial in both cases.

On cross-examination the prosecutor asked Pauldo about his "conviction for a PC 245(a)(4), assault causing grievous bodily injury." Defense counsel objected based on the court's earlier ruling. In a sidebar conference the court stated to the prosecutor, "[Defense counsel] is objecting to the question of grievous bodily injury. That is your take on it. It is not a grievous bodily injury. Just say he was convicted of an assault and leave it at that." At defense counsel's request the court advised the jury, "The previous question about the grievous bodily injury is stricken." Defense counsel, later arguing the question had been a direct violation of the court's ruling because "the People went beyond [referring to a 2015 felony assault conviction] and stated grievous bodily injury on the record," requested "some kind of instruction that the People violated a court ruling." The court denied the request, stating, "Whether it is a felony assault with grievous bodily injury could be the name of the charge itself. I informed

the jury that was stricken.  The only issue was Mr. Pauldo suffered a 2015 conviction for felony assault.”

It is clear even from the lone example Pauldo chose to illustrate the purported futility of defense objections or requests for admonition that, far from a poisonous courtroom atmosphere, the trial court here maintained firm and fair control of the proceedings and was reasonably responsive to defense counsel's frequent objections and requests.  Indeed, the court had sustained, or essentially sustained, defense counsel's objections multiple times and, although it declined to instruct the jury that the prosecutor had violated a court ruling, had agreed to strike the objectionable question.  Pauldo's argument against standard principles of forfeiture lacks merit.  (See *People v. Fuiava*, *supra*, 53 Cal.4th at p. 680 [rejecting defendant's request to excuse his failure to preserve misconduct claims where “the record does not establish that properly framed objections would have been in vain or provoked any ‘wrath’ on the part of the trial court; rather, all indications are that the court was reasonably responsive to defense objections throughout the trial”]; *People v. Friend*, *supra*, 47 Cal.4th at pp. 29-30 [exception to forfeiture was inapplicable because, given the court sustained several of defense counsel's frequent objections to the prosecutor's conduct, the record showed “the trial court kept a firm hand on the actions of the attorneys and maintained a fair proceeding”].)

c. *Pauldo's remaining arguments do not establish prosecutorial misconduct requiring reversal of his conviction*

i. *Referring to Pauldo's 2015 assault conviction as a conviction for "a PC 245(a)(4), assault causing grievous bodily injury"*

Pauldo argues the prosecutor engaged in misconduct because, by referring, as discussed, to Pauldo's 2015 assault conviction as "a PC 245(a)(4), assault causing grievous bodily injury" in his question to Pauldo, he included facts underlying Pauldo's prior conviction and violated the trial court's prior evidentiary ruling. (*People v. Johnson* (1978) 77 Cal.App.3d 866, 873 ["[a] prosecutor who improperly cross-examines a defendant in order to place inadmissible prejudicial evidence before the jury is guilty of misconduct"; "[i]mproper questions that violate a previous ruling by the trial court are particularly inexcusable"].)

Pauldo grossly overstates the nature of the prosecutor's mistake. The prosecutor told the court Pauldo's 2015 aggravated assault conviction was based on his use of a shiv to stab a security guard in the face when enraged by a demand that he leave a bar. When arguing for permission to use that conviction to cross-examine Pauldo, the prosecutor contended that Pauldo had shaved down the golf club used as a weapon in this case, creating a "modified shiv," and that his violent behavior in both instances was similar. It was these underlying facts regarding the 2015 conviction that the trial court excluded as unduly prejudicial. The challenged question did not in any way refer to those facts.

To be sure, the prosecutor misidentified Pauldo's 2015 conviction, which was for assault by means of force likely to cause great bodily injury, as assault causing grievous bodily injury—a

27

distinction unlikely to be significant to most jurors. Whether use of either descriptor clearly violated the court's ruling not to refer to the underlying facts of the offense is debatable. In any event, the court reasonably believed it had neutralized any improper reference by striking the question and directing the prosecutor to simply call the 2015 offense an assault. The prosecutor's erroneous description was neither deceptive nor reprehensible and did not render Pauldo's trial fundamentally unfair. Having struck the question, the court's decision not to further instruct the jury that the prosecutor had violated a ruling was well within its discretion.

ii. *The prosecutor's expressing surprise at his witnesses' memory*

Pauldo contends the prosecutor engaged in misconduct when he stated during closing argument, "The defense asked a lot of questions about my witnesses. . . . Actually, I am surprised that they remembered what they talked about back in March of 20—," which prompted the trial court to tell the prosecutor to "[j]ust be careful" after defense counsel objected on the ground of vouching.

"'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument.'" (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480; see *People v. Thomas* (1992) 2 Cal.4th 489, 529 ["the prosecutor may not interject a personal belief in the merits of the case, as opposed to a belief based on the evidence produced at trial"].) Prosecutors may not "offer their personal opinions when they are based solely on their experience or on other facts outside the

record." (*People v. Huggins* (2006) 38 Cal.4th 175, 207.) "'[T]he prosecutor's comments must . . . be evaluated in the context in which they were made, to ascertain if there was a substantial risk that the jury would consider the remarks to be based on information extraneous to the evidence presented at trial.'" (*People v. Lopez* (2008) 42 Cal.4th 960, 971.)

The prosecutor did not engage in improper vouching. It is clear from his comments his expression of surprise at what his witnesses remembered—that is, the impressiveness of their memory—stemmed from the content of his witnesses' trial testimony and the length of time that had elapsed since the events being recalled, evidence equally available to the jury. (See *People v. Rodriguez*, *supra*, 9 Cal.5th at p. 480 ["[a] prosecutor . . . may make assurances regarding the apparent honesty or reliability of a witness based on the facts of [the] record and the inferences reasonably drawn," internal quotation marks omitted]; see also *People v. Lopez*, *supra*, 42 Cal.4th at p. 971 ["[T]he prosecutor's comment did not imply that she based her belief in defendant's guilt on evidence not presented at trial. To the contrary: Because her statement that she believed defendant was guilty immediately followed her comment that, in her view, defense counsel's cross-examination of the victims demonstrated that they were credible, a reasonable juror would most likely infer that the prosecutor based her belief in defendant's guilt on the credibility of the victims' testimony at trial"].)

iii. *The prosecutor's alleged misstatement of the law of reasonable doubt in closing argument*

In her closing argument defense counsel told the jury, "I will give you examples of what reasonable doubt means. It means you have a doubt that is reasonable. Something doesn't

29

add up.  You still have questions. . . .  If you have one doubt in your mind that is reasonable, the weight of a feather, you must vote not guilty. . . .  There is one fact, the weight of a feather, you find unreasonable, you must vote not guilty.  That is the standard in our criminal courtrooms."

Subsequently, in his final closing argument the prosecutor told the jury he wanted "to make some corrections" in defense counsel's argument about the applicable legal standard.  He said the standard was neither, as had been argued by defense counsel, "if you have unanswered questions, essentially those can be reasonable doubts" nor "if you don't know a particular fact, that is a reasonable doubt."  If the standard were that he had "to prove every fact and every piece of information to [the jury] beyond a reasonable doubt," the prosecutor stated, there would be "no way" he would be able to do so.

The prosecutor argued he only needed to prove beyond a reasonable doubt each of the elements of the two charges against Pauldo and then provided examples of facts he was not obligated or able to prove beyond a reasonable doubt, such as the exact location the incident occurred.  The prosecutor continued, "What I can prove to you beyond a reasonable doubt is that he was struck with a deadly weapon, and that is the standard that you have to apply.  If you start saying every single unanswered question is a reasonable doubt, then you are . . . never going to convict.  There [are] other juries on this floor right now that will apply that same standard, and they are going to have unanswered questions, and they are still going to be comfortable convicting beyond a reasonable doubt—."  Defense counsel objected on the ground of "misstatement of the law," an objection the trial court overruled.

30

On appeal Pauldo argues the prosecutor engaged in misconduct because, by his comments, he had "misstated the law of reasonable doubt and absolved [himself] from overcoming reasonable doubt by comparing the individual opinion of each juror with what other juries would do."  He contends the prosecutor's comments that there were "other juries on this floor right now that will apply that same standard, and they are going to have unanswered questions, and they are still going to . . . convict[ ]" contravene CALCRIM No. 3551, which instructs in part, "Each of you must decide the case for yourself and form your individual opinion after you have fully and completely considered all of the evidence with your fellow jurors.  It is your duty as jurors to deliberate with the goal of reaching a verdict if you can do so without surrendering your individual judgment.  Do not change your position just because it differs from that of other jurors or just because you or others want to reach a verdict.  Both the People and the Defendant are entitled to the individual judgment of each juror."

"'"[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements."'"  (*People v. Bell* (2019) 7 Cal.5th 70, 111.)  "'When attacking the prosecutor's remarks to the jury, the defendant must show that, "[i]n the context of the whole argument and the instructions" [citation], there was "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner."'"  (*People v. Centeno*, *supra*, 60 Cal.4th at p. 667.)  "'In conducting this inquiry, we "do not lightly infer" that the jury drew the most

damaging rather than the least damaging meaning from the prosecutor's statements.'" (*Ibid.*)

Pauldo fails to show the prosecutor's remarks about other juries misstated the law. The point of the comments was simply that, contrary to defense counsel's suggestions, not all unanswered questions, however trivial, necessarily preclude a finding of guilt beyond a reasonable doubt. Pauldo cites no legal authority that this rather unremarkable statement is incorrect. (Cf. *Kaufman v. Goldman, supra,* 195 Cal.App.4th at p. 743; *Mansell v. Board of Administration*, *supra*, 30 Cal.App.4th at pp. 545-546.)

As for any purported misstatement of the legal principles contained in CALCRIM No. 3551, the prosecutor did not state the law permits the jurors to abandon their duty to decide the case for themselves, change their position just because it differs from that of other jurors or otherwise act in contravention to those principles. Moreover, before the commencement of closing arguments, the trial court instructed the jury, "It is up to all of you, and you alone, [to] decide what happened, based only on the evidence that has been presented to you in this trial. . . . If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." Again, after closing arguments, the trial court instructed the jury to decide the case for itself: "Each of you must decide the case for yourself, but only after you have discussed the evidence with other jurors. Do not hesitate to change your mind if you become convinced that you are wrong. But do not change your mind just because other jurors disagree with you." In the context of the entire argument and the instructions, it was not reasonably likely the jury either understood the prosecutor's comments to mean the law permitted

32

the jurors to surrender their independent judgment or otherwise act in a manner contrary to the principles set forth in CALCRIM No. 3551 or applied his remarks to do so.

### 3. *The Trial Court's Instruction to the Deadlocked Jury Was Not Improper*

#### a. *Background*

On December 10, 2019 the trial court received a note from the jury that stated, "We are a hung jury. Next step?" At that point the jury had deliberated for slightly less than two hours. At the court's request the presiding juror clarified the jury was deadlocked as to both counts and stated the jury had taken four ballots.

The court asked, "Without telling me how many voted each way, let me ask you, on the first ballot what was the actual split? Ten to two, six to six?" After some initial confusion the presiding juror explained the first vote was 10 to two on count 1 and nine to two, with one juror needing additional information, on count 2. The court also inquired, "Without telling me which way was the vote, which was the last ballot?" The foreperson responded the most recent ballot showed a vote of 11 to one on both counts.

The court asked the presiding juror if there was anything he thought it could do to assist in reaching a verdict; the presiding juror replied he did not think so. The court then made the following statements to the jury:

"You all have been deliberating two hours. I appreciate your hard work. As you might imagine a lot of work goes into a trial. A lot of resources go into a trial. I would say the evidence in this case took about three days or so. You have been deliberating two hours. I very much appreciate that.

33

"Because it is 20 minutes to three in the afternoon, I can't take a hung jury from you right now. I believe you should deliberate a little bit longer. I am going to order you back in there. I am not going to tell you how to deliberate. I will ask you to come back and talk some more. If you get close to four [o']clock and you are still hung, please tell me. A lot of resources are put in a trial, and we would like to have a verdict.

"I thank you all very much for your hard work and ask you to continu[e] your actual deliberations at this time."

Almost an hour after being asked to continue its deliberations, the jury returned to the courtroom. Although the jury remained deadlocked as to count 2, it had reached a verdict of guilty on count 1.

> b. *The trial court's statements did not constitute an erroneous Allen-type or mini-Allen charge*

Pauldo contends the trial court's statement to the jurors that a lot of work and resources go into a trial, as well as its statement "[a] lot of resources are put in a trial and we would like to have a verdict," constituted an Allen-type or mini-Allen charge proscribed by the Supreme Court in *People v. Gainer* (1977) 19 Cal.3d 835 (*Gainer*) and *People v. Barraza* (1979) 23 Cal.3d 675 (*Barraza*).

In *Gainer*, *supra*, 19 Cal.3d 835, the Supreme Court considered for the first time the propriety of an instruction, given to jurors reporting difficulty in reaching a verdict, "of a type commonly referred to either as the '*Allen* charge,'" a name derived from the United States Supreme Court case *Allen v. United States* (1896) 164 U.S. 492, "or the 'dynamite charge,'" and concluded further use of the instruction should be prohibited in California. (*Gainer*, at pp. 840, 842-843.) The *Gainer* Court

34

"isolate[d] the two elements frequently found in such instructions . . . which raise the gravest doubts as to their propriety." (*Id.* at p. 845.)

The first element, which the Court characterized as "most questionable," is "the discriminatory admonition directed to minority jurors to rethink their position in light of the majority's views."[4] (*Gainer*, *supra*, 19 Cal.3d at p. 845.) Such an admonition, the Court determined, "would . . . be objectionable as a judicial attempt to inject illegitimate considerations"—which the Court identified as the "position of the majority of jurors at the moment" and the minority's "own status as dissenters"—"and as an appeal to dissenting jurors to abandon their own independent judgment of the case against the accused." (*Id.* at pp. 848-849.) The admonition to minority jurors would also be objectionable as exerting "'undue pressure upon the jury to reach a verdict.'" (*Id.* at p. 850.)

---

[4]     Specifically, in *Gainer* the trial court's instruction to the jury included the statements "if much the larger of your panel are for a conviction, a dissenting juror should consider whether a doubt in his or her own mind is a reasonable one, which makes no impression upon the minds of so many men or women equally honest, equally intelligent with himself or herself, and [who] have heard the same evidence with the same attention and with an equal desire to arrive at the truth and under the sanction of the same oath. [¶] And, on the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably and ought not to doubt the correctness of a judgment, which is not concurred in by most of those with whom they are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows." (*Gainer*, *supra*, 19 Cal.3d at p. 841, internal quotation marks omitted.)

The second element in improper Allen-type instructions is the direction by the trial court, "'You should consider that the case must at some point be decided,' with its attendant implication that a mistrial will inevitably result in a retrial." (*Gainer*, *supra*, 19 Cal.3d at p. 851.)  The Court explained "an instruction which implies that a hung jury will assuredly result in a retrial" is objectionable as misstating the law because the case may be dismissed rather than retried and "[t]hus the inconclusive judgment of a hung jury may well stand as the final word on the issue of a defendant's guilt."  (*Id*. at p. 852.)

The *Gainer* Court concluded by holding "it is error for a trial court to give an instruction which either (1) encourages jurors to consider the numerical division or preponderance of opinion on the jury in forming or reexamining their views on the issues before them; or (2) states or implies that if the jury fails to agree the case will necessarily be retried." (*Gainer*, *supra*, 19 Cal.3d at p. 852.)

In *Barraza, supra,* 23 Cal.3d 675 the Supreme Court reviewed the effect of "a jury instruction declaring 'If you fail to agree upon a verdict, the case will be tried before another jury,'" which the *Barraza* Court "denominated a mini-Allen charge" because, although it involved *Gainer's* second element, the instruction did not include the direct admonition to minority jurors that the *Gainer* Court had determined to constitute the "more highly prejudicial portion" of a "full Allen charge." (*Barraza*, at pp. 680, 682.)  Relying on *Gainer*, *supra*, 19 Cal.3d 835, the *Barraza* Court stated the trial court had clearly erred in giving the mini-Allen charge to the jury.  (*Barraza*, at p. 683.)

Here, unlike in *Gainer*, *supra*, 19 Cal.3d 835, 845, 852, the trial court did not instruct the jurors with the first element of an

improper Allen-type instruction by giving a "discriminatory admonition directed to minority jurors to rethink their position in light of the majority's views" or otherwise "encourage[ ] jurors to consider the numerical division or preponderance of opinion on the jury in forming or reexamining their views on the issues before them."[5]  That the trial court's instruction to continue deliberations was made to a jury reporting a deadlock of 11 to one does not render it a discriminatory admonition directed to a minority juror to reconsider his or her position in light of the majority's opposing viewpoint.  (See *People v. Whaley* (2007) 152 Cal.App.4th 968, 974, 983 [characterizing, in a case where the court ordered jurors to continue deliberations after the jury reported an 11-to-one deadlock, the trial court's suggestion to consider a role-playing method of deliberation that applied to both the minority and majority jurors as "unlike an improper *Allen* charge that asks only the minority jurors to reconsider their positions"]; cf. *People v. Pride* (1992) 3 Cal.4th 195, 265-266

---

[5]     A trial court may properly inquire as to the numerical division of the votes without seeking to ascertain the number for conviction and acquittal.  (See, e.g., *People v. Howard* (2008) 42 Cal.4th 1000, 1030; *People v. Proctor* (1992) 4 Cal.4th 499, 538; 6 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012 & 2020 supp.) Criminal Judgment, § 41; see also *People v. Brooks* (2017) 3 Cal.5th 1, 90 (*Brooks*) [rejecting contention the trial court's inquiry into the numerical split in the jury's votes was coercive as communicating to the minority jurors that the court "wanted them to change their minds" because at no time did the court suggest to the jurors they should reconsider their views in light of the numerical breakdown of the votes and, when questioning the presiding juror, the court cautioned him to provide only the numerical breakdown of the deadlock and not which way the votes went].)

[trial court did not err in requesting jury continue to deliberate after learning of 11-to-one vote].)

The trial court also did not instruct the jury with the second element of an improper Allen-type instruction—directing that the case must at some point be decided or otherwise stating or implying that a failure of the jury to agree would necessarily result in a retrial. Relying on language in *Barraza* that he quotes out of context, Pauldo contends the jury would "naturally infer[ ] . . . the possibility of a retrial" from the trial court's statements that a lot of work and resources go into a trial. However, the *Barraza* Court did not hold that referring to the resources devoted to a trial should be construed as improperly implying a retrial would occur if the jury were to fail to agree. Rather, the Court, which had already determined the trial court's statement "'If you fail to agree upon a verdict, the case will have to be tried before another jury'" constituted an improper mini-Allen charge, considered the prejudicial impact of that charge. It concluded that the trial court's statement regarding expenses that had been incurred by both parties,[6] although not expressly linked to the expense of a prospective retrial, nevertheless improperly implied

---

[6]    In *Barraza*, the trial court instructed the jury, which had reported a deadlock, "For the parties involved, the case is an important one, and its presentation to you has involved expenses to both sides. If you fail to agree upon a verdict, the case will have to be tried before another jury selected in the same manner and from the same source as you were chosen. There is no reason to believe that the case will ever be submitted to a jury more competent to decide it." (*Barraza, supra,* 23 Cal.3d at pp. 681-682.)

"the expense and inconvenience of a retrial"[7] because "the link is obvious and will naturally be inferred by the jurors once the subject is introduced." (*Barraza, supra*, 23 Cal.3d at p. 685.) Because an improper reference to the expense of a retrial "augments the substantial, if subtle, pressure created by the improper instructions concerning the need for retrial," the Court concluded the improper mini-Allen charge was prejudicial and necessitated reversal of the conviction. (*Ibid.*) In contrast, the trial court's comments in the case at bar did not introduce the subject of a retrial or otherwise state or imply that a failure of the jury to agree would inevitably result in a retrial. Those comments thus did not implicate the second element of an improper Allen-type instruction identified in *Gainer* by misstating the law as to retrials.

Of course, a trial court's instruction to an apparently deadlocked jury may be improper even if it does not contain the two elements expressly proscribed by *Gainer.* A court "must exercise its power [to order further deliberations] . . . without coercing the jury, and 'avoid displacing the jury's independent judgment "in favor of considerations of compromise and expediency."'" (*People v. Brooks* (2017) 3 Cal.5th 1, 88 (*Brooks*).) "Coercion occurs where 'the trial court, by insisting on further deliberations, expresse[s] an opinion that a verdict should be reached.'" (*People v. Peoples* (2016) 62 Cal.4th 718, 783.)

In *Brooks, supra*, 3 Cal.5th at pages 88 through 89 the Supreme Court considered and rejected the defendant's

---

[7] As observed by the *Barraza* Court, the *Gainer* Court, in a footnote, stated a reference to the expense and inconvenience of a retrial is impermissible. (*Gainer, supra*, 19 Cal.3d at p. 852, fn. 16; *Barraza, supra,* 23 Cal.3d at p. 685.)

contention the trial court's instruction to continue deliberations after the jurors had reported a deadlock coerced the jury's penalty verdict. As observed by the Court, the trial court did not "either express or imply to the jurors that they must reach a unanimous verdict, or a particular outcome." (*Id.* at p. 89.) Although the trial court in *Brooks* remarked to the jury that "[e]ach and every one of us in this courtroom has a lot invested in the case in terms of our time, our energy, and if we can reach a decision, I'd like to," the court clarified immediately after making its remark it was "not suggesting that [the jury] should reach any decision one way or the other" and had earlier expressly stated it was not "looking for a certain decision . . . or favoring a certain decision" from the jurors. (*Brooks*, at p. 90, internal quotation marks & italics omitted.) Accordingly, "[v]iewing the [trial] court's remarks as a whole," the *Brooks* Court "conclude[d] the jury would not have understood the comments as a warning that failure to reach a verdict would waste both the parties' time and judicial resources." (*Ibid.*; see *People v. Peoples, supra,* 62 Cal.4th at p. 783 [concluding "[t]he trial court's statements to the jury, given the totality of the circumstances, were not coercive" because, "[a]lthough the trial court's statement that 21.5 hours of deliberation was a 'drop in the bucket,' when read in isolation, could be construed as an inducement to reach a verdict, the trial court's complete remarks do not suggest that the court crossed the line from encouragement to coercion"].)

Similarly, although Pauldo argues, by informing the jury that "[a] lot of resources are put in a trial and we would like to have a verdict," the trial court coerced the jury's verdict on count 1, the trial court's instructions, viewed as a whole, were not coercive. The court did not express or imply at any time that the

jurors must reach a unanimous verdict or a particular outcome. Indeed, before the jurors commenced their deliberations, the court instructed with CALCRIM No. 3550, stating in part, "You should try to agree on a verdict if you can. Each of you must decide the case for yourself, but only after you have discussed the evidence with the other jurors. Do not hesitate to change your mind if you become convinced that you are wrong. But do not change your mind just because other jurors disagree with you." (See *People v. Reed* (2018) 4 Cal.5th 989, 1015-1016 [the court's instructions before commencement of the jury's deliberations—specifically, "'each of you must consider the evidence for the purpose of reaching a verdict *if you can do so,*'" "'each of you must decide the case for yourself'" and the jurors should not "'decide any question in a particular way because a majority of the jurors, or any of them, favor that decision'"—"'adequately conveyed that jurors did not need to reach a verdict, and that they should not acquiesce in a verdict with which they did not agree'"].)

Even after the jury reported it was deadlocked on both counts, the trial court advised the jury, "I am not going to tell you how to deliberate." It also directed the presiding juror not to tell it how many jurors voted each way, thus "communicat[ing] to the jury that [it] was not concerned with the direction of the voting." (*Brooks*, *supra*, 3 Cal.5th at p. 90.)

More fundamentally, Pauldo's argument the trial court's instruction suggested a verdict had to be reached is belied by the court's clear indication that, if deliberations continued for another hour—until 4:00—without verdicts, the court would then declare it a hung jury. The court was simply asking the jurors to finish the day before concluding they were hopelessly deadlocked, and it did so in entirely appropriate language.

In addition, defense counsel did not object in the trial court to the court's instruction to the deadlocked jury that Pauldo now contends were coercive, which further indicates the jury similarly would not have perceived the court's remarks as coercive. (See *People v. Whaley*, *supra*, 152 Cal.App.4th at p. 983 [concluding trial court's instruction to the deadlocked jury was not coercive in part because "we observe that the United States Supreme Court has stated that where, as here, defense counsel does not object to a supplemental instruction, 'such an omission indicates that the potential for coercion argued now was not apparent to one on the spot'"], quoting *Lowenfield v. Phelps* (1988) 484 U.S. 231, 240.) Finally, that the jury remained deadlocked on one of the two counts charged confirms the jurors did not view the court's remarks as an appeal to abandon their own independent judgment in favor of considerations of compromise and expediency or as otherwise coercive.

4. *The Trial Court Did Not Commit Reversible Error in Instructing with an Unmodified Version of CALCRIM No. 875*

a. People v. Aledamat *and alternative-theory error*

Instructing the jury on the elements of assault with a deadly weapon using CALCRIM No. 875, the court stated, in part, "a deadly weapon other than a firearm is any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury." It did not include additional (optional) language in CALCRIM No. 875 that defines an

inherently deadly weapon as one that "is deadly or dangerous in the ordinary use for which it was designed."

In *People v. Aledamat* (2019) 8 Cal.5th 1 (*Aledamat*), a section 245, subdivision (a)(1), aggravated assault case involving use of a box cutter,[8] the Supreme Court determined it was error to instruct the jury pursuant to CALCRIM No. 875 that a weapon could be either inherently deadly or deadly in the way it had been used when the weapon could not be inherently deadly as a matter of law.[9] Because the trial court did not define "inherently deadly" and thus "the jury would not be equipped to know that, contrary

---

[8] In *Aledamat* the defendant had threatened to kill his victim with a box cutter "from three or four feet away." The jury found him guilty of assault with a deadly weapon and making a criminal threat and, as to the threat charge, found true the section 12022, subdivision (b)(1), allegation that defendant personally used a deadly or dangerous weapon. (*Aledamat*, *supra*, 8 Cal.5th at pp. 4-5.)

[9] The *Aledamat* Court explained, "'Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citation.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury. In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue.'" (*Aledamat*, *supra*, 8 Cal.5th at p. 6.) Noting a knife can be, and usually is, used for innocent purposes and a boxcutter is a "'type of knife' . . . '. . . designed to cut things and not people,'" *Aledamat* reaffirmed, "'[A] box cutter cannot be an inherently deadly weapon "as a matter of law"'" (*Id.* at pp. 6, 8.)

43

to what the instruction suggested, a box cutter is *not* an inherently deadly weapon" (*Aledamat*, at p. 8), the error in permitting the jury potentially to convict the defendant under the legally erroneous theory a box cutter was inherently deadly had to be evaluated under the "beyond a reasonable doubt" standard of review established in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) for federal constitutional error. (*Aledamat*, at p. 3.) Explaining application of the *Chapman* standard in a case involving alternative-theory error constituting a "misdescription[ ] of the elements of the charged offense," the Court held, "The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Id.* at pp. 9, 13.)[10] Applying that standard to the case before it, the Supreme Court held it was clear beyond a reasonable doubt the error did not contribute to the verdict: Although a box cutter is not inherently deadly, "if used to assault someone, i.e., used as a *weapon*, a box cutter *is* potentially deadly even if not designed for that purpose." (*Aledamat*, at p. 14.)

> b. *Any alternative-theory error was harmless beyond a reasonable doubt*

Pauldo argues, because a golf club is not designed to be used as a deadly weapon (see *People v. Koback* (2019) 36 Cal.App.5th 912, 934 ["[w]e infer a likelihood of serious injury

---

[10] The Court expressly disapproved cases that "limit[ed] the reviewing court to an examination of the jury's findings as reflected in the verdict itself" in alternative-theory cases. (*Aledamat*, *supra*, 8 Cal.5th at p. 13.)

when people use inherently dangerous weapons in assaults because those weapons are specifically designed to inflict such injury"; however, "the same is not true for golf clubs . . . and other generally innocuous objects"]), the trial court, by instructing the jury on the elements of aggravated assault with an unmodified version of CALCRIM No. 875, which referred to both a weapon that is inherently deadly and one that is used in such a way that it is likely to cause death or great bodily injury, committed prejudicial alternative-theory error under *Aledamat*. Whatever the merits of Pauldo's contention of alternative-theory error, any such error was harmless beyond a reasonable doubt in the circumstances of this case.

The theoretical danger in the erroneous instruction at issue in *Aledamat* was that, without a definition of an inherently deadly weapon, the jurors "could reasonably classify a box cutter, which is sharp and used for cutting, as inherently dangerous based on the common understanding of the term" and, thus, potentially convicted the defendant regardless of the manner in which he had used the box cutter. (*Aledamat, supra,* 8 Cal.5th at p. 8.) No similar risk exists with respect to an allegation the defendant assaulted the victim with a golf club. As a practical matter, a reasonable juror could find a deadly weapon was used in the attack only if he or she determined the golf club was, in fact, wielded in a manner that could cause death or great bodily injury.

The prosecutor emphasized the need for this finding in his closing argument, which did not refer to the inherently deadly concept but instead explained to the jury the golf club was "potentially" deadly depending on its use: "[T]here are really four acts with a deadly weapon. [¶] . . . [T]he first three are the

strikes with the golf club. The first three times [Pauldo] strikes [Rivera] when [Rivera] is holding up the chair, each of those is sufficient to be an act with a deadly weapon. There is no dispute a metal golf club is potentially a deadly weapon. . . . If it hits you, it can knock you unconscious, cause brain trauma, chip your teeth. Anyone knows a golf club to the head, especially utilized with the force enough to break it in half, is probably sufficient to cause grievous bodily injury. [¶] . . . [¶] When you try to strike someone with a golf club or try to stab them with a metal stick in the face, especially if you are making contact with them or the chair they are holding, that is sufficient to know that could directly result in the application of force." For her part, defense counsel argued Pauldo had acted in self-defense when he struck Rivera with the golf club, never suggesting that Pauldo did not use the club in a manner capable of inflicting great bodily injury. (See *Aledamat*, *supra*, 8 Cal.5th at p. 14 ["[t]he arguments of counsel support [the] conclusion" it was "unlikely the jury would simply view the box cutter as inherently deadly without considering the circumstances, including how defendant used it"].)

In addition, in connection with the section 12022, subdivision (b)(1), deadly weapon enhancement alleged as part of the count charging Pauldo with making a criminal threat, the court, using CALCRIM No. 3145, instructed, "'In determining whether or not an object is a deadly weapon, consider all the surrounding circumstances, including when and where the object was possessed . . . and any other evidence that indicates whether the object would be used for a dangerous, rather than a harmless, purpose." The *Aledamat* Court, quoting substantially the same language in the trial court's instruction on the deadly weapon

46

enhancement for the charge of making a criminal threat, concluded, "Given this additional instruction, it seems unlikely the jury would simply view the box cutter as inherently deadly without considering the circumstances, including how defendant used it." (*Aledamat*, *supra*, 8 Cal.5th at pp. 4, 14; cf. *id*. at p. 21 (conc. & dis. opn. of Cuéllar, J.).)[11]

By finding Pauldo guilty of aggravated assault, the jury necessarily rejected his argument that he had been acting in self-defense when, as established by the evidence including Pauldo's own testimony, he swung the golf club toward Rivera, breaking it upon impact with the chair held by his victim. No reasonable jury could have failed to find "a golf club swung repeatedly as a bludgeon at an individual hard enough to break it" (as Pauldo himself characterizes the incident at bar) was "used in such a way that it was capable of causing and likely to cause death or great bodily injury," even if it were theoretically possible the jury had also believed it to be inherently deadly. (Cf. *Aledamat*, *supra*, 8 Cal.5th at p. 15 ["'[n]o reasonable jury that made all of these findings could have failed to find' that defendant used the box cutter in a way that is capable of causing or likely to cause death or great bodily injury"].)

---

[11] In his separate opinion Justice Cuéllar expressed concern that the additional instruction applied to the deadly weapon enhancement and not specifically to the assault charge. (*Aledamat*, *supra*, 8 Cal.5th at p. 21.) In the case at bar, however, the court instructed the jury to "[p]ay careful attention to all of these instructions and consider them together."

## DISPOSITION

The judgment is affirmed.


PERLUSS, P. J.


We concur:


SEGAL, J.


FEUER, J.